UNITED STATES DISTRICT  COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KATHLEEN BABINEAUX BLANCO, in her official capacity as Governor, State of Louisiana; and STATE OF LOUISIANA, by and through Attorney General Charles C. Foti, Jr. | CIVIL ACTION |
| VERSUS | |
| REJANE "JOHNNIE" BURTON, in her official capacity as Director, Minerals Management Service; MINERALS MANAGEMENT SERVICE; DIRK KEMPTHORNE, in his official capacity as Secretary, United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and | NO.  06-3813 |
| AMERICAN PETROLEUM INSTITUTE (Intervenor) | SECTION  "N"  (1) |

## <u>ORDER AND REASONS</u>

Before the Court is the Motion for Preliminary Injunction filed in the above-captioned matter by Plaintiffs, Kathleen Babineaux Blanco, in her official capacity as Governor, State of Louisiana (individually referred to as "Governor"); and State of Louisiana, by and through Attorney General Charles C. Foti, Jr. (together with the Governor referred to as "Plaintiffs" or "State"). Memoranda in opposition have been filed by Defendants, Rejane "Johnnie" Burton, in her official capacity as

1

Director, Minerals Management Service; Minerals Management Service; Dirk Kempthorne, in his official capacity as Secretary, United States Department of the Interior; United States Department of the Interior (together referred to as "Defendants", separately "MMS" and "DOI" respectively); and by Intervenor, American Petroleum Institute ("API").  The Court is also in receipt of a memorandum in reply filed by Plaintiffs.  Oral argument was heard on Plaintiffs' motion on August 8, 2006, after which the Court took the matter under submission.

## I.  <u>SUMMARY OF DISPOSITION</u>

The issue posed to the Court is simply whether preliminary injunctive relief should be issued during the pendency of this action, which calls into question compliance by MMS and DOI with various Congressionally-mandated environmental requirements in connection with Lease Sale 200. On the showings made by the parties, and considering the applicable law, the arguments set forth in briefs and at oral argument, as well as the exhibits provided, the Court this day rules as follows:

(1)     Because there has not been a sufficient showing of irreparable harm which could occur during the interim between the time of this ruling and the upcoming trial date, the Plaintiffs' Motion for Preliminary Injunction is **DENIED**;

(2)     Counsel for all parties are to confer (with the assistance of the assigned magistrate judge, if necessary) no later than Monday, August 29, 2006, to determine what, if any, discovery will be necessary to prepare this matter for trial, and schedule whatever discovery is desired.

(3)     A pre-trial conference will be held in this matter on Friday, November 3, 2006, at 9:30 a.m.; the final pre-trial order shall be due in chambers by 4:30 p.m. on Tuesday, October 31, 2006;

(4)     The parties are to confer with the magistrate judge to discuss a possible resolution
of this matter no later than Friday, October 28, 2006; and

(5)     Trial in this matter, including the Plaintiffs' request for permanent injunctive relief,
is fixed for **Monday, November 13, 2006,** at **8:30 a.m.**

Critical to the Court's ruling today is the fact that this matter can be fixed for trial in short order.  Balancing the risk of irreparable harm by any act committed by Defendants against the relatively short period of time necessary to prepare and try this matter on the declaratory and permanent[1] injunctive relief, the Court finds the entry of a preliminary injunction, particularly one as broad as suggested by Plaintiffs, to be unwarranted.  Plaintiffs specifically claim irreparable harm as a result of indirect and cumulative impact of Lease Sale 200, particularly the impact on resources, onshore infrastructure and coastal residents.  *See* Pls' Memo. at 65.  Because any actions taken pursuant to Lease Sale 200 between now and the upcoming trial date will have no such impact, the Court declines issuance of pre-trial injunctive relief.

However, finding that Plaintiffs have a substantial likelihood of success on the merits for at least some of the claims asserted, this ruling does not prejudice Plaintiffs' right to seek (or this Court's authority to issue) permanent injunctive relief as a result of the November 13, 2006 trial, including the enjoining of any and all activities conducted pursuant to any leases awarded between now and the trial date, until Defendants are in compliance with the applicable Congressionally-mandated requirements.  The Court expects that the parties will confer in good faith to prepare this matter for trial, and, more importantly, to attempt to achieve a resolution of the perceived

---

[1]This injunctive relief, if granted, would be "permanent" until there is compliance by Defendants with any federal laws deemed applicable and unsatisfied after trial on the merits.

3

inadequacies of the Defendants' attempts to comply with the relevant statutory authorities that form

the basis of this action, as set forth more specifically herein.

## II.   FACTUAL AND LEGAL BACKGROUND

### A.  The Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, established

federal jurisdiction over the subsoil and seabed of the outer Continental Shelf ("OCS")[2] and

attachments thereto.  *See* 43 U.S.C. §§ 1332(1), 1333(a)(1).  As stated in the OCSLA, it is the policy

of the United States that "the outer Continental Shelf is a vital national resource reserve held by the

Federal Government for the public, which should be made available for expeditious and orderly

development, subject to environmental safeguards, in a manner which is consistent with the

maintenance of competition and other national needs."  43 U.S.C. § 1332(3).  In accordance with

such policy, Congress entrusted the Secretary of the Interior ("the Secretary") with the duty of

overseeing and promulgating regulations concerning leasing of the OCS.  *See*  43 U.S.C. § 1334(a).

In carrying out his duties, the Secretary is required to consider and balance the potential for

environmental harm, the potential for adverse impact to the coastal zone, and the potential for the

discovery of resources, while also ensuring the public a fair and equitable return on the resources

of the OCS.  *See*   43 U.S.C. §§ 1334(a)(1), 1344(a)(3), 1344(a)(4).  The OCSLA specifically

authorizes the Secretary to grant oil and gas leases to the highest, qualified, and responsible bidder

or bidders on the basis of sealed competitive bids.  *See* 43 U.S.C. § 1337(a)(1).  The Secretary has

---

[2]The OCSLA defines the outer Continental Shelf as "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control."  *See* 43 U.S.C. § 1331(a).  Essentially, the outer continental shelf is the area of the continental shelf beyond the territory of the coastal states (for the most part beyond 3 miles from coast land, but in some areas beyond 9 miles from coast land).  *See* 43 U.S.C. §§ 1312, 1313 (defining and describing the seaward boundaries of the coastal states).

4

designated MMS, a bureau within the DOI, as the administrative agency responsible for the mineral leasing of submerged OCS lands and for the supervision of offshore operations after lease issuance.

**B.  Lease Sale 200**

**1.  2002-2007 Program**

Section 18 of the OCSLA calls for the preparation of an oil and gas leasing program indicating a 5-year schedule of lease sales designed to best meet the Nation's energy needs. *See* 43 U.S.C. § 1344.  In accordance with Section 18, in 2002, the MMS issued its "Proposed Final Outer Continental Shelf Oil & Gas Leasing Program" for years 2002 to 2007 ("2002-2007 Program"). Under the 2002-2007 Program, the areas of the OCS available for mineral development and production are divided into various planning areas.  Included in those planning areas is the Western Gulf of Mexico planning area ("WPA"), a plot located south of Texas and Louisiana.  The 2002-2007 Program proposes one lease sale each year from 2002 until 2006 in the WPA.  Lease Sale 200 is the final lease sale proposed in the 2002-2007 Program for the WPA.  Under Lease Sale 200, MMS plans to offer for lease all available, unleased blocks within the WPA for oil and natural gas operations.[3]  Currently, as noted in its "Final Notice of Sale (FNOS) 200," MMS intends to open and publicly announce bids received for blocks offered in Lease Sale 200 on August 16, 2006.

**2.  Preparation for Proposed Lease Sale 200**

In preparing for Lease Sale 200, MMS issued several statements and determinations aimed at complying with various federal statutory requirements addressing environmental concerns. Additionally, much correspondence regarding such documents and regarding compliance with

---

[3]Under Lease Sale 200, 3,865 blocks of approximately 20.87 acres in the WPA would be leased to successful bidders. *See* Def's Exh. 1. The blocks are located from three to about 210 miles offshore in water depths of eight to more than 9,843 feet.

federal law passed between MMS and the State of Louisiana in the months prior to the proposed sale date. In November of 2002, MMS published a "Final Environmental Impact Statement" ("multi-sale EIS"), which purports to address the environmental impacts of most of the lease sales proposed in the 2002-2007 Program for the Central and Western Gulf of Mexico planning areas, including proposed sales 185, 190, 194, 198, 187, 192, 196 and 200.[4]  MMS prepared a single Environmental Impact Statement ("EIS")  for these nine Central and Western Gulf sales because, according to MMS, "each lease sale proposal and projected activities [were] very similar each year for each planning area." Pls' Exh. 2 at 1-3.  In the multi-sale EIS, MMS noted that a National Environmental Policy Act ("NEPA") review would be conducted prior to each of sales 190, 194, 198, 192, 196 and 200.  Consequently, in March of 2006, MMS published its "Environmental Assessment" ("EA") with respect to proposed Lease Sale 200.[5]

As stated by MMS, "the EA [was] prepared to aid in the determination of whether or not new available information indicates that the proposed lease sale [200] would result in new significant impacts not addressed in the multisale EIS."  Pls' Exh. 7 at 1.  The EA, therefore, incorporates by reference and tiers off of all relevant material contained in the multi-sale EIS.  It also incorporates by reference all relevant material contained in EAs produced for Lease Sales 196 and 192.  In

----

[4]The public process for the multi-sale EIS began on September 12, 2001, when MMS published in the Federal Register a Call for Information and Notice of Intent to Prepare the EIS.  *See* 66 Fed. Reg. 47499-02, 47,500 (2001).  The public process ended when MMS announced a notice of availability of the final multi-sale EIS on Nov. 12, 2002.  *See* 67 Fed. Reg. 68684 (2002).

[5]MMS announced its intent to prepare an EA for proposed Lease Sale 200 on November 22, 2005.  *See* 70 Fed. Reg. 70633 (2005).  Interested parties were provided with a 30-day public comment opportunity.  *Id*. at 70634.  The State of Louisiana, through its agencies, was the only party to submit comments.  On April 4, 2006, MMS issued a notice of availability of the EA.  *See* 71 Fed. Reg. 16825 (2006).  Again, a 30-day public comment period was provided.  *Id*.  MMS sent a copy of the EA directly to the Louisiana Governor's office on April 12, 2006, in which MMS requested comments from the state by the close of the public comment period.  *See* Pls' Exh. 9.

Section 1 of the EA, entitled "Objectives of the Environmental Assessment," MMS indicates that, in preparing for and composing the EA, it reexamined all potential environmental effects of the proposed action, i.e. Lease Sale 200, and the alternatives of such action based on "any new information regarding potential impacts and issues not available at the time MMS prepared the multisale EIS in November 2002." *Id*. MMS further states that, in developing the EA, it placed particular emphasis on changes that have occurred as a result of Hurricanes Katrina and Rita. *Id*. According to MMS, upon considering such information, it concluded that "[n]o new information was discovered that would require the full reevaluation of any resource nor alter the conclusions of the multisale EIS." *Id*. Accordingly, along with the Lease Sale 200 EA, MMS issued a "Finding of No New Significant Impact" ("FONNSI"). In its FONNSI, MMS acknowledges that new information was incorporated into the EA that was not considered in the multi-sale EIS. However, MMS asserts that such information merely supports or elaborates upon analysis or information contained in the multi-sale EIS–it does not *change* any analysis or conclusions contained therein. In light of this, MMS concludes that "no new significant impacts were identified for Proposed Lease Sale 200 that were not already assessed in the multisale EIS" and that the composition and issuance of a supplemental EIS is not necessary. Pls' Exh. 7, FONNSI.

On May 17, 2006, the State of Louisiana submitted a letter to MMS with comments regarding the EA and FONNSI. *See* Pls' Exh. 12. In the letter, the State expressed disapproval of the measures taken by MMS in preparation for Lease Sale 200. Specifically, the State asserted that "[t]he EA and FONNSI ... are simply insufficient to reasonably address the shortcomings in coastal protection laid bare by the storms" and that "MMS has failed, perhaps in the simple rush to stay on the schedule identified in the Multisale 2002 ... EIS, to take the necessary steps with which it is

charged under [federal law] to ensure for the protection of Louisiana's coastal zone and the infrastructure." *Id*. According to the State, the analysis in the EA of the damage caused by Hurricanes Katrina and Rita, which hit the Gulf Coast in August and September of 2005, respectively, to OCS facilities and the corresponding environment is cursory at best due to the fact that it is based upon and tiers off of "now outdated NEPA documents." *Id*. In response, MMS indicated that it uses the best information available at the time to prepare its NEPA documents and that, as new information evolves, baseline discussions and impacts and analysis can be enhanced over time accordingly. *See* Pls' Exh. 14. MMS further noted that, in its opinion, the impacts of a single lease sale are minor and that the "incremental contribution of an individual lease sale to cumulative impacts is insignificant." *Id*.

In preparing for Lease Sale 200, MMS also issued a Consistency Determination ("CD"), entitled "Determination of Whether Proposed Western Gulf of Mexico Lease Sale 200 Is Consistent With the Louisiana Coastal Resources Program," which was received by Louisiana's Secretary of Natural Resources in March of 2006. MMS issued the CD in accordance with Section 307(c)(1) of the Coastal Zone Management Act ("CZMA"), as amended, which requires that all federal agency activity affecting any land, water use or natural resource of the coastal zone be carried out "in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *See* 16 U.S.C. § 1456(c)(1)(A). Like the EA prepared for Lease Sale 200, the CD incorporates and tiers off of a previous documentation–specifically, the CD for Lease Sale 187, which was held in August of 2003.[6] Additionally, according to MMS, the CD

---

[6]In its Lease Sale 200 CD, MMS states that it incorporates the Lease Sale 187 CD "[t]o aid [its] efforts to streamline Coastal Zone Management consistency processes and reduce unnecessary paperwork." Pls' Exh. 5.

focuses on "the updated information from the Sale 200 and 196 EA's that was not available for the preparation of the Sale 187 EA." Pls' Exh. 5. In the CD, MMS ultimately concludes that nothing in the conduct, terms and conditions, location or configuration of the proposed Lease Sale would preclude or otherwise prevent exploration, development and production activities from being conducted in a manner consistent with the Louisiana Coastal Resources Program ("LCRP") and that Lease Sale 200 will be consistent, as much as possible, with the policies of the LCRP identified by Louisiana as enforceable.

On June 14, 2006, the State submitted comments to MMS objecting to the CD.[7] *See* Pls. Exh. 15. As in its letter to MMS regarding the EA, in its letter regarding the CD, the State criticized MMS for allegedly failing to fully address the devastation of Hurricanes Rita and Katrina in its assessments. *Id*. The State urged that "MMS *must* provide a more up-to-date environmental evaluation, to support its CD, that fully takes into account the new information resulting from the storms and the new circumstances facing the State in the wake of the devastation that occurred last year." *Id*. The Regional Director of MMS responded to the State's comments with a three-paragraph letter indicating that, while MMS takes the position that Lease Sale 200 is consistent with the enforceable policies of the LCRP, MMS personnel would be willing to meet with relevant State

---

[7]Before this, by letter dated April 13, 2006, LDNR notified MMS that the information presented in MMS's CD was inadequate to allow review of the proposed Lease Sale and that the State deemed the 60-day review period to be postponed until pertinent information and documents were received by the State. *See* Pls' Exh. 8. In its letter, LDNR stated that the CD "ignores the incredible damages wrought by the hurricanes of 2005, and the need to evaluate all coastal activities with a new appreciation to the potential for severe storm impacts." *Id*. LDNR further explained that adequate information to evaluate certain specific LDNR guidelines is yet to be compiled and distributed. *Id*. Without such information, LDNR concludes that review of certain LDNR guidelines cannot be completed. *Id*. In response, the Director of MMS stated it was the understanding of MMS that, based on the State's responses to the CD's for previous lease sales held in the WPA, that the tiered approach to CDs was adequate and appropriate. Pls' Exh. 11. The Director further asserted that "hurricane-related impacts occur independently of impacts related to OCS lease sales." *Id*. According to MMS, the CD for Lease Sale 200 is complete. *Id*.

personnel to discuss the States' concerns. *See* Pls' Exh. 16.  Notably, a meeting between the parties never took place.

In addition to the above-reference correspondence between the State and MMS regarding proposed Lease Sale 200, on May 30, 2006, the State submitted a letter to MMS regarding the timing of the proposed Lease Sale 200, pursuant to Section 19 of the OCSLA.  *See* Pls' Exh. 13. In the letter, the Governor recommended that Lease Sale 200 be postponed and included in the 2007-2012 program currently being prepared by MMS.  *Id.*  In support of her recommendation, Governor Blanco stated that postponement of Lease Sale 200 would allow MMS the opportunity to meaningfully assess the impact of OCS activities in light of the devastation wreaked on the Gulf Coast as a result of the 2005 hurricanes.  *Id.*  The Governor further urged that a delay of the Lease Sale would provide the State and its local communities with a greater opportunity to participate in the future development of OCS resources in the aftermath of the hurricanes, as well as the ability to prepare for the impact of future OCS activities.  *Id.*

In a letter dated July 11, 2006, MMS responded to the concerns voiced by Governor Blanco. *See* Pls' Exh. 21.   In the letter, MMS indicated its rejection of the State's recommendation to postpone the Lease Sale and confirmed that it would move forward with Lease Sale 200 as planned. *Id.*  Among the reasons stated by MMS in support of this position were the potential that uncertainty in the MMS lease sale process would cause companies to invest elsewhere; the impact that delay or cancellation of the sale may have on the State of Texas; the impact on new natural gas supplies being delivered that a delay in the sale would cause; and the potentially hundreds of millions of dollars that the U.S. Treasury could lose as a result of delay.  *Id.*  In light of these reasons, MMS determined that Governor Blanco's recommendation to postpone Lease Sale 200 did not "provide

for a reasonable balance between the national interest and the well-being of the citizens of the State of Louisiana." *Id.* Accordingly, on July 17, 2006, MMS published its Final Notice of Lease Sale 200, advising the public that the sale would begin in exactly 30-days. *See* 71 Fed. Reg. 40538 (2006).

## C. Action for Declaratory and Injunctive Relief By State

Soon after, on July 20, 2006, Governor Blanco and the State of Louisiana filed a Complaint for Declaratory and Injunctive Relief in this Court against Defendants, Rejane "Johnnie" Burton; Director of MMS; MMS; the DOI; and Dirk Kempthorne, Secretary of the DOI.[8] On August 4, 2006, the Court granted the unopposed motion of API for leave to intervene as a Defendant in this matter. API's motion was generally based on its assertions that the grant of any of the forms of relief sought by Plaintiffs would cause substantial loss to API and its members and that APIs interest in this matter could not be adequately represented by the Defendants.

Plaintiffs' four-count Complaint alleges violations by Defendants of the Administrative Procedure Act ("APA"), the National Environmental Protection Act ("NEPA"), the CZMA, and the OCSLA. In their "Request for Relief," Plaintiffs ask the Court to declare that Defendants have violated and continue to violate said statutes and their implementing regulations; to enjoin Defendants from opening any bids submitted in response to the Notice of Sale on Lease Sale 200, or awarding any lease pursuant to the Sale; to issue a writ of mandamus preventing Defendants from acting in the allegedly unlawful manner described in the Complaint and requiring Defendants to act in the manner requested by Plaintiffs during the pendency of this action; and to grant other relief deemed just, proper and equitable.

---

[8]Governor Blanco filed the suit in her official capacity as Governor of Louisiana; Ms. Burton and Mr. Kempthorne were sued in their respective official capacities as Director of MMS and Secretary of the DOI.

On July 27, 2006, Plaintiffs filed the Motion for Preliminary Injunction presently before the Court.  In their memorandum in support of their motion, Plaintiffs urge that "[t]he extraordinary remedy of a preliminary injunction is necessary to avoid the potentially irreparable harm occasioned by allowing the MMS to proceed, arbitrarily and capriciously, with Lease Sale 200 without first complying with the requirements of NEPA, the CZMA and the OCSLA."  Plaintiffs specifically request that the Court enjoin Defendants from opening any bids or awarding any leases in connection with Lease Sale 200 until a final ruling has been issued on the merits of the claims raised by Plaintiffs in their Complaint.[9]

### III.   STATEMENT OF THE ISSUE PRESENTED FOR DISPOSITION

In resolving the motion before it, the Court must determine, as any court must in considering a motion for a preliminary injunction, whether (1) Plaintiffs have a substantial likelihood of

---

[9]In their proposed preliminary injunction order, Plaintiffs would have this Court broadly enjoin Defendants as follows:

Plaintiffs' Motion for Preliminary Injunction is HEREBY GRANTED;

IT IS FURTHER ORDERED that Defendants, REJANE "JOHNNIE" BURTON, in her official capacity as Director, Minerals Management Service; MINERALS MANAGEMENT SERVICE; DIRK KEMPTHORNE, in his official capacity as Secretary, United States Department of the Interior; and UNITED STATES DEPARTMENT OF THE INTERIOR; and their officers, employees, and representatives, are hereby ENJOINED from holding Lease Sale 200 and opening any bids or awarding any leases in connection with such Lease Sale, until resolution of this action or further order of this Court.

Moreover, the State highlights two MMS-initiated studies relative to the impact of Hurricanes Katrina and Rita on existing OCS-related onshore infrastructure, suggesting that Lease Sale 200 be delayed until these reports are prepared. *See* Complaint, ¶ 64 & 65; Pls' Memo. at 39.  These studies are expected to take 18 and 24 months to complete, respectively.  Although the Complaint suggests that these studies must be part of MMS's environmental assessment, counsel for Plaintiffs confirmed at oral argument that the duration of the injunctive relief sought was not tethered to the completion of these studies.

Regardless, it is the undersigned's belief that, even if injunctive relief were warranted to protect against the irreparable harm Plaintiffs claim, such relief could and should be more narrowly tailored than as suggested here by Plaintiffs.

prevailing on the merits of the claims that they have asserted in their Complaint; (2) Plaintiffs face a substantial threat of irreparable harm if the preliminary injunction sought is not granted; (3) the threatened injury to Plaintiffs outweighs any potential harm that an injunction may cause to Defendants; and (4) the injunction will not adversely effect the public interest.  *See PCI Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005); *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990).  In considering Plaintiffs' motion, the Court notes that a preliminary injunction "'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries a burden of persuasion'."  *See Black Fire Fighters Ass'n of Dallas*, 905 F.2d at 65 (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  *See also*, *Louisiana v. Lujan,* 777 F. Supp. 486, 487 (E.D. La. 1991).

## IV.   LAW AND ANALYSIS

### A.   Plaintiffs' Likelihood of Success on the Merits

#### 1.   Overview of Plaintiffs' Substantive Claims

Plaintiffs state claims under the NEPA, 42 U.S.C. § 4321 *et seq*.; the CZMA, 16 U.S.C. §§ 1451–1466; and the OCSLA, 43 U.S.C. § 1331 *et seq.*

Under the NEPA, Plaintiffs claim that MMS's FONNSI with respect to Lease Sale 200 was arbitrary and capricious because it did not (1)  identify and assess the existing environmental baseline and (2) failed to adequately analyze the direct, indirect, and cumulative impacts of the proposed action.  Pls' Memo. at 22.  Plaintiffs point to language in the previous multi-sale EIS indicating that future lease sales would warrant preparation of a Supplemental EIS ("SEIS") if, in the meantime, significant environmental issues had arisen or if the previous EIS was deemed

inadequate. *Id*.  The Gulf hurricanes of 2005 are precisely the sort of changed circumstances that warrant a fresh look at the baseline and impact assessments, the State argues.

Under the CZMA, Plaintiffs claim that MMS acted arbitrarily and capriciously by (1) failing to support its CD with comprehensive information and data and (2) failing to address the bulk of the State's Coastal Use Guidelines in making its CD.  *Id.* at 35-37.  Plaintiffs argue that by incorporating its analysis from earlier CDs without considering those Guidelines in the light of the destruction the 2005 hurricanes wreaked on coastal wetlands and barrier islands, MMS has failed to demonstrate that Lease Sale 200 is fully consistent with Louisiana's coastal use regulations.  *Id.* at 45.

Finally, under the OCSLA, Plaintiffs claim that MMS acted arbitrarily and capriciously by failing to accept the Governor's recommendation that Lease Sale 200 be postponed until the 2007-2012 leasing cycle.  *Id.* at 54.  Plaintiffs claim that the plain language of the OCSLA requires that the Governor's recommendation as to timing is owed considerable deference and must be accepted if it provides for a reasonable balance between the national interest in a particular activity and the well-being of an affected community.  *Id.* at 57.

**2.  APA Legal Standard of Review for Plaintiffs' Substantive Claims**

Because Plaintiffs are not afforded, nor do they contend that they are afforded, a private right

of action for their substantive claims under the NEPA,[10] the CZMA[11] or the OCSLA,[12] the Court will review such claims pursuant to the APA. The APA allows "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to seek judicial review of such action.[13] *See* 5 U.S.C. §§ 702, 704; *Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004). Agency actions subject to review under the APA are those that are made reviewable by statute, as well as those that constitute "final agency action[s] for which there is no other adequate remedy in a court." *See* 5 U.S.C. § 704.

Under the APA, a court may "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706. It may also "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[14] *Id*. The Fifth Circuit has noted that this "arbitrary and capricious"

---

[10]*See generally*, 42 U.S.C. § 4321 *et seq*; *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434 (5th Cir. 1981) (finding that the claimant did not demonstrate that an implied private right of action was provided under the NEPA). *See also Spiller v. White*, 352 F.3d 235, 240 (5th Cir. 2004) (finding that a party objecting to an agency decision not to conduct an EIS under the NEPA may challenge such a decision only under the APA).

[11]*See generally*, 16 U.S.C. § 1451-1466. *See also*, *Akiak Native Community v. United States Postal Serv.*, 213 F.3d 1140, 1144 (9th Cir. 2000) (stating that "[j]udicial review of actions under CZMA ... ordinarily is governed by the APA").

[12]*See generally*, 43 U.S.C. § 1331 *et seq*; *OXY USA, Inc. v. Babbitt*, 122 F.3d 251, 259 (5th Cir. 1997) (finding that Congress did not intend for the "citizen suit" provision of the OCSLA, 43 U.S.C. § 1349(a)(1), "to operate ... as a means of obtaining 'umbrella' review for a series of agency decisions that were or will be otherwise subject to judicial review under the APA").

[13]Under the statute, as amended, a claimant may name the United States as a defendant if it/he so chooses. *See* 5 U.S.C. § 702.

[14]Under the APA, a Court may also hold unlawful and set aside agency action, findings, and conclusions found to be "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" "without observance of procedure required by law;" "unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;" or "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." *See* 5 U.S.C. § 706(2).

standard is a highly deferential standard of review.  *See Sabine River Auth. v. U.S. Dept. of the Interior*, 951 F.2d 669, 678 (5th Cir. 1992).  Consequently, although the inquiry of the reviewing court must be "searching and careful," the standard of review, ultimately, is a narrow one.  *Marsh v. Oregon Nat. Resources Counsel*, 490 U.S. 360, 378 (1989).  A court reviewing agency actions under the APA "arbitrary and capricious" standard may not substitute its own judgment for that of the agency–rather, it must cautiously review the administrative record to ensure that the agency has derived a reasoned judgment from the consideration and application of all pertinent factors.  *Id*; *Sabine River Authority*, 951 F.2d at 679.   In other words, the court must consider whether the agency made a "clear error of judgment" with respect to its allegedly wrongful action.  *Marsh*, 490 U.S. at 378.  An agency action may be held to be arbitrary and capricious under the following specifically identified circumstances:  "[T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [its decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Louisiana Envtl. Action Network v. United States Envtl. Protection Agency*,  382 F.3d 575, 582 (5th Cir. 2004) (quoting *Texas Oil & Gas Ass'n v. United States Envtl. Protection Agency*, 161 F.3d 923, 934 (5th Cir. 1998)).

### 3.  The State's NEPA Claim

Congress enacted the NEPA with the goals of "declar[ing] a national policy which will

---

Plaintiffs do not contend, nor does the Court find, that such provisions are applicable to Plaintiffs' claims in the instant action.  *See Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 376 (holding that where the issue before a Court is whether a supplemental EIS should be filed by an agency under the NEPA, the proper standard of review under the APA is the "arbitrary and capricious" standard).

encourage productive and enjoyable harmony between man and his environment" and "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  An essentially procedural Act, the NEPA requires each federal agency to consider all significant aspects of the potential environmental impact of an action proposed by such agency.  *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983).  In other words, under the NEPA, agencies must take a "hard look" at the potential environmental consequences of a major action prior to taking the action.  *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21 (1976)).  That being said, the statute does not command an agency to choose an environmentally preferable course of action.  *Sabine River Auth.*, 951 F.2d at 676.  As stated by the Fifth Circuit, the "'NEPA merely prohibits uninformed–rather than unwise–agency action'."  *See id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)).  Its demand is that the decision of an agency to proceed with a federal  project that will significantly affect the environment be an environmentally conscious decision.  *Id.*

To ensure action, compliance and public awareness, the NEPA directs all federal agencies to incorporate an EIS into reports or recommendations on proposals for major federal actions that may significantly affect the environment.  An EIS is a statement detailing, among other things, "the environmental impact of the proposed action;" "any adverse environmental effects which cannot be avoided should the proposal be implemented;" and "alternatives to the proposed action."  *See* 42 U.S.C. § 4332(2)(c);  40 C.F.R. § 1508.11 (defining EIS); 40 C.F.R. § 1501.4 (describing instances in which an EIS should be prepared by an agency).  *See also*, *Baltimore Gas and Elec. Co.*, 462 U.S. at 97 (stating that one of the purposes of the NEPA is to ensure that the public will be informed as to whether an agency has considered environmental concerns in its decision-making process).

17

To determine whether to prepare an EIS, in other words, whether an action is one that may significantly affect the environment, an agency should prepare an EA. *See* 40 C.F.R. §§ 1508.9, 1501.3, 1501.4. After preparing an EA, if an agency determines that an EIS is unnecessary, it may issue a "Finding of No Significant Impact" ("FONSI"), a document in which it describes why a proposed action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13. If an agency determines that an EIS is warranted, it is required to prepare a supplemental EIS if significant new circumstances or information develop that are relevant o environmental concerns and bear upon the proposed action itself or its potential impacts. 40 C.F.R. § 1502.9.

As stated above, Plaintiffs contend that Defendants acted arbitrarily and capriciously in determining that an SEIS was not warranted under the NEPA with respect to Lease Sale 200. The premise of the Defendants' contention that it has complied with the NEPA is simply that "no new significant impacts were identified for proposed Lease Sale 200 that were not already assessed in the multi-sale EIS." However, in considering whether "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts", 40 C.F.R. § 1502.9(c)(1), the EA fails to recognize certain fundamental changes in the devastated coastline of Louisiana. Clearly, the earlier multi-sale EIS was rendered inadequate in some respects, irrelevant in others, by the well-documented catastrophic effects of the 2005 hurricanes.

The Court notes that in the EA, MMS provided discussion of the damage caused by the 2005 hurricanes to OCS facilities; the overall impact of the hurricanes to the wetlands and barrier islands; the effects of the hurricanes on water quality and on the health of species contained therein; the destruction caused to refineries and impact on oil production caused by the storms; and other similar

18

information.  However, with little or no analysis as to why, MMS concludes virtually every discussion of changes caused by the hurricanes with a generalized statement that its prior conclusions as to the impacts of OCS activities in connection with Lease Sale 200 remain unchanged.  Abbreviated summaries and unsupported conclusions do not suffice for insightful and well-reasoned analysis of potential significant impacts as the result of changed circumstances *See Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 299 (D.C. Cir. 1988).  The Court agrees with the State's submission that the direct, indirect and cumulative impacts of the proposed activity are likely to be significantly different; and that the EA provides no real analysis or insight of why those impacts are not now different.

Moreover, the multi-sale EIS baseline demographic projections include assumptions based upon continuity of existing social, economic, and technical trends, however, those assumptions were, for the most part, blown away in the winds and waters of Hurricanes Katrina and Rita.  Given the substantial evidence[15] before this Court that material changes have occurred since the Fall of 2002 with respect to the affected baseline environment,[16] as well as the tendentious conclusions set forth in MMS's EA, the Plaintiffs' likelihood of success on the merits is strong.

Earlier, in the multi-sale EIS compiled in 2002, MMS recognized the precarious vulnerability

---

[15]*See,* e.g., the affidavits of Mr. Robert G. Bea, Mr. Mark S. Davis and several others attached to Plaintiffs' Memorandum.

[16]*See,* e.g., factors discussed by the Fifth Circuit in *Gulf Restoration Network v. U.S. Department of Transportation,* No. 05-60321, 2006 U.S. App. LEXIS 14172 (5th Cir. 2006).

and existing deterioration of areas such as Lafourche Parish, and specifically Port Fourchon.[17]  Defs'
Exh. 4 at 3-74 through 3-75.  It further noted that deterioration of highways "grows worse every
day."  *Id.* at 3-75.  This assessment was made almost four years ago, without considering the impacts
of Hurricanes Katrina and Rita, both of which passed close to this area of coastal Louisiana, and
various other lesser noted storms since 2002 that may have impacted this area sufficiently to warrant
a supplemental EIS.[18]  At the hearing, counsel for Defendants conceded that additional activities
conducted pursuant to Lease Sale 200 might further deteriorate the area, including Louisiana
Highway 1, "a little", but assured:  "It won't be significant."  Thus, the quotidian damages will be
undeniably greater nonetheless.  The problem in making such an assessment of insignificant future
damage is that it is relative:  "insignificant" as compared to the 2003 status, or insignificant
compared to the 2006 situation?  And to what extent are they truly different?

The Court is guided by the U.S. Supreme Court's opinion in *Marsh v. Oregon Natural*

---

[17]The original EIS, prepared in 2002, notes that, in that locality, "citizens' quality of life has
decreased.  The most significant negative impacts include (1) increased OCS activity is straining the local
infrastructure; (2) the area is suffering with a substandard highway that will not be able to handle the truck
traffic increase anticipated from OCS activities; (3) severe coastal erosion is eating away the State's hurricane
protection, endangering the infrastructure and industry; and (4) salt water intrusion from coastal erosion is
impacting the drinking water supply."  Defs' Exh. 2 at 3-74.

[18]The U.S. Supreme Court has held, with regard to the need to supplement an EIS:

"... [I]n the context of reviewing a decision not to supplement an EIS, courts should not
automatically defer to the agency's express reliance on an interest in finality without
carefully reviewing the record and satisfying themselves that the agency has made a reasoned
decision based on its evaluation of the significance-or lack of significance-of the new
information.  A contrary approach would not simply render judicial review generally
meaningless, but would be contrary to the demand that courts ensure that agency decisions
are founded on a reasoned evaluation "of the relevant factors."

*Marsh,* 490 U.S. at 378.

*Resources Council* as to when an agency must supplement its NEPA analysis:

> If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* at 374; *see also Sierra Club v. Froehlke,* 816 F.2d 205, 209-210 (5th Cir. 1987). The Court notes that the Fifth Circuit has also provided instruction as to the necessity of providing an SEIS. The Court of Appeals has stated, "The principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS'." *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1051 (5th Cir. 1985) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984). Thus, in considering whether an SEIS was required in the instant case, the Court must consider whether information regarding changes to the environment as a result of the 2005 hurricanes raises "'raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of [proposed Lease Sale 200] is necessary'." *Id*.

In this case, Plaintiffs have demonstrated that there indeed is new information, perhaps in abundance, pertaining to the significant impacts Hurricanes Katrina and Rita had on the entire coastal area of Louisiana, with regard to damaged infrastructure, displacement of population, extensive damage to offshore facilities, and damage to wildlife and fisheries (particularly as a result of the intrusion of salt water into previously fresh water areas), among other altered factors. While it is true that the previous EIS discussed many facets as they existed some four years ago, it is equally undeniable that the Louisiana coast has suffered significant damage, and threats to the State

are enhanced by increased industrial activities off the Louisiana coast.

In their Reply Memorandum, Plaintiffs also argue that there are direct conflicts within MMS's missives to the State.  The Court notes that the March 2006 EA recognizes in conclusory fashion that:

> Hurricanes Katrina and Rita damaged much of the shore-based infrastructure in the Gulf of Mexico.  In addition, many of the demographic and economic factors (employment, income and wealth, etc.) for individual counties and economic areas (LA 1, LA2, etc.) have changed as a result of the 2005 hurricane season.  It will be some time before the full extent of these changes is known.

Pls' Exh. 7 at 12.  Then, in its letter of June 14, 2006, MMS, through Regional Director Chris Oynes, asserts that "the infrastructure and employment are already in place, and any activities with Lease Sale 200 will basically maintain the status quo."[19]  *See* Pls' Exh. 14 at 2, which is also quoted in Defs' Memo at 41.  While there might well be a logical rationale that reconciles these statements, the issue highlights the notion that, rather than a well-researched analytical approach to post-Katrina/Rita Louisiana, MMS and DOI have instead hastily provided expedient language designed to facilitate its preexisting decision.

Based on the law and the submission of the parties, it is difficult to say that Plaintiffs are not likely to prevail on their NEPA claim.  Plaintiffs have called into question whether the *Marsh* standard, requiring Defendants to take a "hard look" at the new circumstances posed by the 2005 hurricanes, has been met by MMS/DOI.

**4.  The State's CZMA Claim**

---

[19]One is given to wonder whether the "status quo" referenced by Mr. Oynes is that of the 2002 multi-sale EIS or the post-Katrina status supposedly considered in the March 2006 EA.

In enacting the CZMA, 16 U.S.C. § 1451-1466, Congress declared a national policy to protect the coastal zone;[20] to promote the development of coastal zone management programs by the states and participation in such programs; and to encourage interaction and cooperation between federal and state agencies involved in programs affecting the coastal zone.  *See*  16 U.S.C. § 1452; *Secretary of the Interior v. W. Oil and Gas Ass'n*, 464 U.S. 312, 316 (1984).  Once a state coastal zone management program has been approved by the Secretary of Commerce,[21] Section 307(c) of the CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of [such program]."[22]  16 U.S.C. § 1456(c)(1)(A).  Accordingly, a federal agency carrying out an activity affecting any coastal use or resource must provide a "consistency determination" to the relevant state agency prior to commencing such activity.[23]  16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.34(a)(1).  If the state objects, a federal agency may proceed with its proposed activity only if it has concluded

---

[20]The "coastal zone" includes the "coastal waters ... and the adjacent shorelands ... , strongly influenced by each other and in proximity to the shorelines of the several coastal states."  16 U.S.C. § 1453.

[21]16 U.S.C. § 1454 requires a coastal state that has developed a coastal zone management program to submit its program to the Secretary of Commerce for review and approval.  *See* 16 U.S.C. § 1454.

[22]Federal agencies are encouraged to obtain the views and assistance of pertinent State agencies to determine whether a proposed activity of the Federal agency will be conducted in a manner consistent to the maximum extent practicable with the enforceable policies of the State's coastal zone management program.  15 C.F.R. § 930.34(d).  The term "consistent to the maximum extent practicable"  means "fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency."  15 C.F.R. § 930.32(a)(1).

[23]The CD should be provided to the State agency at the earliest practicable time, but it must be provided no later than 90 days prior to final approval of the Federal activity, unless the Federal and State agencies mutually agree to a different schedule.  16 U.S.C. § 1456(c)(1)(C).  In order to facilitate review of the CD by a State agency, a Federal agency should coordinate with the State agency prior to providing the State agency with the CD.  15 C.F.R.§ 930.34(a)(1).

23

that consistency with the enforceable policies of the state's management program is prohibited by existing law applicable to the federal agency, and has described to the state, in writing, the legal impediments to full consistency with the state's policies; or if it determines that its activity is fully consistent with the state's enforceable policies.[24]  15 C.F.R. § 930.43(d).

The Court has considered whether the CD for Lease Sale 200 is in violation of § 307(c) of the CZMA and 15 C.F.R. § 930.39.[25]  Void of anything more than a perfunctory passing mention of such, the MMS has failed to include new, pertinent information that reflects significantly-changed circumstances after Hurricanes Katrina and Rita.  Accordingly, the CD does not take into account the increased environmental and economic risks to Louisiana's OCS supporting infrastructure and

---

[24]Regulations require a State agency to inform the Federal agency from which it has received a CD of its concurrence with or objection to the CD as soon as possible, but if the State agency's response is not received by the Federal agency within 60 days of receipt by the State of the CD, then the Federal agency may presume concurrence on behalf of the State agency.  *See* 15 C.F.R. § 940.41(a).  A Federal agency must approve at least one request by a requesting State agency for an extension period of 15 days or less to respond.  15 C.F.R. § 930.41(b).  The Federal agency may approve longer extensions depending upon the magnitude and complexity of the CD.  *Id.*  Should a State agency object to a CD, the Federal and State agencies are encouraged to attempt to resolve their difference, to consider using dispute resolution mechanisms provided for by regulation and statute, and to consider postponing final federal action until the problems identified have been resolved.  15 C.F.R.§ 930.43(d).

[25]15 C.F.R. § 930.39 provides that "[t]he consistency determination shall include a brief statement indicating whether the proposed activity will be undertaken in a manner consistent to the maximum extent practicable with the enforceable policies of the management program." *See 15* C.F.R. § 930.39(a).  Section 930.39 also provides that "[t]he statement must be based upon an evaluation of the relevant enforceable policies of the management program." *Id.*  Additionally, section 930.30 directs as follows:

> The consistency determination shall also include a detailed description of the activity, its associated facilities, and their coastal effects, and comprehensive data and information sufficient to support the Federal agency's consistency statement. The amount of detail in the evaluation of the enforceable policies, activity description and supporting information shall be commensurate with the expected coastal effects of the activity.

*Id.*

sensitive coastal resources.[26]

In particular, as evidenced by the questioning at the hearing, MMS's treatment of the Coastal Use Guidelines set forth in the LCRP is so inadequate as to suggest that proceeding with Lease Sale 200 was a *fait accompli* even before the CD was compiled. MMS has failed to demonstrate, as it must, that the action and its direct, indirect and cumulative impacts are consistent with those of Louisiana's 94 Coastal Use Guidelines that would apply herein.[27] Thus, because the CD does not adequately evaluate all of the "relevant enforceable policies" of the LCRP pursuant to 15 C.F.R. § 930.39(a), it would appear to have been compiled in an arbitrary and capricious manner such that the result, i.e. the occurring of the Lease Sale, was fore-ordained.

For instance, according to MMS, the 2006 CD for Lease Sale 200 tiered off of the CD prepared by MMS for 2003 for Lease Sale 187, i.e., the previous CD is incorporated by reference. The summary of new information incorporated into the subject CD is set forth in three sections: (1) "New or Revised Mitigation and Regulations for OCS Operations"; (2) "Updates on OCS-Related Analyses and Studies"; and (3) "New Data on the Affected Environment." Despite these promising titles, nowhere does the record provide for mitigation of impacts on Louisiana's coastal resources. In fact, the CD identifies very few areas of new data pertinent to the affected environment: MMS states new population estimates for cetaceans in the northern Gulf of Mexico, a revised marine

---

[26]Defendants argue that the State did not object to the Lease Sale 187 CD, which contains pertinent incorporated information. This argument, however, begs the question, failing to appreciate or further examine changed circumstances. If Defendants believe the circumstances have not changed, their new CD offers little or no insight as to the basis for such belief.

[27]At the hearing, counsel for the DOI and MMS could not identify which of the guidelines are relevant, and where a reasoned analytical discussion of them could be found in the CD. Counsel for the State agreed that not all 94 Guidelines are relevant, but except for those discussed hereafter, did not claim others had not been adequately treated by Defendants.

mammal impact analysis, an updated sea turtle impact analysis, and also recognizes that a total of approximately 118 square miles of land was transformed into new water areas just in the area from the Chandeleur Islands to the Atchafalya River.[28]  Although MMS claims to have "incorporated the information and analysis from prior lease sale CDs" (Defs' Memo. at 56), in response to comments and recommendations that the State of Louisiana provided to MMS on December 22, 2005, the Court finds such a summarily conclusive statement to be palliative in nature.

Under 15 C.F.R. § 930.39(b), federal agencies must ensure that the effects on any coastal use or resource, or associated facilities "[are] consistent to the maximum extent practicable with the enforcement policies of the [State's] management program."  *See*  15 C.F.R. § 930.39(b).  In this instance, however, very few of Louisiana's requirements under its federally-approved coastal management program are even mentioned in the Lease Sale 200 CD.  In fact, out of the 94 Coastal Use Guidelines in the LCRP, the CD analysis addresses only four:  (a) possible impacts to natural biologically valuable areas; (b) possible impacts to long-term biological productivity; (c) disposal of wastes; and (d) environmental and emergency response plans.  The CD then incorporates previous discussions, assumptions and conclusions made in connection with Sale 187, compiled in 2003.  The Court finds that the failure of the CD to address the current status under Guidelines 1.6[29], 1.7[30], 6.1[31],

---

[28]The report also notes the significant fact that, from 2004-05, the change from land to water in just the area of coastal Louisiana east of the Mississippi River was 72.9 square miles; as compared with the previous projection of only 60 miles of land loss for this area for the entire half-century of 2000-2050.  Pls' Exh. 5 at 6-7 (*citing* USGS Reports latest land-water changes for southeastern Louisiana, USGS (February 2006)).  The summary goes on to recognize that, as a result of Hurricane Katrina alone, the Chandeleur Islands have been reduced by one-half of their pre-storm land area.  It has further been estimated by a USGS survey that some 225 square miles of land and marsh have been transformed into open water just by the passing of Hurricanes Katrina and Rita.

[29]Guideline 1.6 requires consideration of, *inter alia*, thirteen categories, including the existence of necessary infrastructure to support the use and public cost resulting from the use; the extent of impacts on existing and traditional uses of the area and on future uses for which the area is suited; the extent of impacts

26

10.5[32], 10.9[33], 10.10[34], and 10.11[35], among others, surely creates a flawed analysis, and one based upon stale information which does not account for the severe impact and resulting changed circumstances left after Hurricanes Katrina and Rita.  Aside from the resulting and obvious land loss previously mentioned, no consideration is given to resulting changes in access routes utilized for mineral exploration, production and refining sights, storage facilities, significant infrastructure damage to roads, bridges, and other means of transportation of not only product, but also workers, emergency or contingency plans to be developed under these new circumstances in connection with all mineral operations, and general effective environmental and coast line protection in light of the dramatically different circumstances evidenced in Plaintiffs' submissions.

---

on navigation, fishing, public access, and recreational opportunities; the flood and storm hazard characteristics of the site; and the extent of long-term benefits or adverse effects.

[30]Guideline 1.7 requires avoidance of certain adverse impacts, including impacts on the locality of the use and affected governmental bodies; destruction or adverse alterations of streams, wetlands, tidal passes, inshore waters and water bottoms, beaches, dunes, barrier islands and other natural biologically-valuable areas or protective coastal features; adverse land loss, erosion and subsidence; and increases in the potential for flood, hurricane or other storm damage, or increases in the likelihood that damage will occur from such hazards.

[31]Guideline 6.1 requires that industrial activities, such as those which are reasonably foreseeable as resulting from the Lease Sale, take place, to the maximum extent practicable, only where flood and storm hazards are minimal or where protection from these hazards can be reasonably well achieved, and where public safety would not be unreasonably endangered.

[32]Guideline 10.5 requires that access routes to mineral exploration, production and refining sites be designed and aligned so as to avoid adverse impacts on critical wildlife and vegetation areas to the maximum extent practicable.

[33]Guideline 10.9 requires that all drilling and production equipment, structures, and storage facilities be designed and constructed utilizing best practical techniques to withstand all expectable adverse conditions without releasing pollutants.

[34]Guideline 10.10 requires that mineral exploration, production and refining facilities be designed and constructed using best practical techniques to minimize adverse environmental impacts.

[35]Guideline 10.11 requires that effective environmental protection and emergency or contingency plans shall be developed and complied with for all mineral operations.

Plaintiffs further maintain that Article IX, § 1 of the Louisiana Constitution is also an enforceable policy of the LCRP.  That Article provides, in part:  "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety and welfare of the people."  *See* LA. CONST. art. IX, § 1.  Despite Plaintiffs' assertion, however, the Court believes that the LCRA, if fully complied with in the CD, would establish compliance with Article IX.  In other words, though Article IX, § 1 could indeed be read as a separate requirement which the CD must satisfy, it is clearly more general than the LCRP provisions and guidelines, and satisfaction of those provisions would, in the opinion of the undersigned, indicate compliance with Article IX, § 1.

Recognizing that the CZMA requires that each consistency determination should be made on a case-by-case basis, pursuant to 16 U.S.C. § 1456(c), the Court finds, on the showing made here, MMS's treatment of these issues in this instance to be rather perfunctory.[36]  It is apparent that the cavalier approach adopted to these critical issues rendered a seemingly inadequate result, and one that might fall below the "arbitrary and capricious" standard, indicating Plaintiffs' substantial likelihood of success on the merits of the CZMA claim.

**5.  The State's Claim Under Section 19 of the OCSLA**

---

[36]Plaintiffs also contend that, in the event of a disagreement, the CZMA conflict resolution procedures contained in the Defendants' Departmental Manual should have been employed.  While it is not clear why these procedures designed to resolve many of the State's objections were not utilized herein by MMS, the failure to do so is surely not helpful to the Defendants' position that its conduct was not arbitrary and capricious.  In fact, such failure to comply with the procedures set forth in 15 C.F.R. § 930.11 is further suggestive that the end result, i.e. the opening of bids and awarding leases under Lease Sale 200, was a foregone conclusion which did not warrant further consideration, even under the outlined procedures set forth in the CZMA.

The stated purpose of the Outer Continental Shelf Lands Act Amendments of 1978 is to expedite the exploration and development of the outer continental shelf, while assuring the protection of marine and coastal environments. *See* 43 U.S.C. § 1802. To accomplish these goals, the Act prescribes a complicated series of consultations, permits, plans, and licenses covering the leasing and development process and involving governmental and regulatory bodies at the federal, state, and local levels. *See* 43 U.S.C. §§ 1331-56.

The Act segments the process of developing oil and gas leases into four phases:  preparation of a leasing plan, leasing, exploration, and development and production. *See* 43 U.S.C. § 1344(a)(3); *Secretary of the Interior v. California,* 464 U.S. 312, 337-340 (1984) (describing the four-stage structure of the OCSLA).  In the leasing phase, the phase at issue here, the Secretary grants oil and gas leases on the submerged lands of the outer continental shelf under a competitive bidding system. *See*  43 U.S.C. § 1337(a)(1) (granting the Secretary to grant leases to the highest responsible qualified bidder(s)).  The lease entitles the lessee to explore, develop, and produce oil and gas contained within the boundaries of his lease, conditioned upon due diligence and "the approval of the development and production plan required by this Act."  43 U.S.C. § 1337(b)(4).

The Act imposes a specific duty to balance oil and gas production and environmental health in only two instances.  First, in the preparation phase, the Secretary prepares a five year plan for leasing specific tracts on the outer continental shelf thought to contain oil and gas.  43 U.S.C. § 1344(a).  As noted above, in preparing the plan he is required to

> select the timing and location of leasing, to the maximum extent practicable, so as
> to obtain a proper balance between the potential for environmental damage, the
> potential for the discovery of oil and gas, and the potential for adverse impact on the
> coastal zone.

43 U.S.C. § 1344(a)(3).  Challenges under this section, however, fall within the sole jurisdiction of the United States Court of Appeals for the District of Columbia.  43 U.S.C. § 1349(c)(1).

A duty to proceed in a balanced manner is also imposed by 43 U.S.C. § 1345(c).  The governor of any state affected by the proposed development may, within sixty days after receiving notice of a proposed lease sale, submit recommendations to the Secretary "regarding the size, timing, or location of any proposed lease sale."  43 U.S.C. § 1345(a).  The Secretary is required to accept the governor's recommendations if he determines, after providing an opportunity for consultation, that "they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State."  43 U.S.C. § 1345(c).  The Secretary's decision either way must be communicated to the governor in writing and cannot be set aside unless it is arbitrary or capricious.  43 U.S.C. § 1345(c), (d).

The Act does not describe the process by which the Secretary is to determine whether the recommendations of a governor "provide for a reasonable balance," and there is no guidance in the

case law of this Circuit.[37]  The legislative history is also unclear as to precisely how much deference

---

[37] Two district court cases in the First Circuit have considered this issue, both concluding that the Secretary's failure to accept a governor's recommendation was arbitrary and capricious. *See Commonwealth of Massachusetts v. Clark*, 594 F. Supp. 1373, 1387 (D. Mass. 1984); *Conservation Law Found. v. Watt*, 560 F. Supp. 561, 579 (D. Mass. 1983), *aff'd* 716 F.2d 946 (1st Cir. 1983). A district court in Alaska came to the opposite conclusion in another case, but that case concerned objections raised by non-governmental bodies under the OCSLA and other statutes who likely did not have standing to bring recommendations to the Secretary in the first place. *Village of False Pass v. Watt*, 565 F. Supp. 1123, 1138 (D. Alaska 1983), *aff'd* 733 F.2d 605 (9th Cir. 1984).

a governor's recommendation is owed.[38]

In this case, the Governor of Louisiana submitted recommendations pursuant to § 1345(a). The Secretary did not accept these recommendations, but rather provided a cryptic response dated July 11, 2006.  That letter, however, contains a rather casual dismissal of the Governor's recommendations by simply claiming that "delay in leasing for even one sale will cause a discernable impact on new natural gas supplies being delivered." Pls' Exh. 21.  Because the reasons stated in this letter existed *prior* to the Governor's recommendations of May 30, 2006[39], and are unimpacted by any consideration of the recommendation from the Governor, whether valid or inconsequential, the distinct impression created is that, no matter what recommendations the Governor submitted, they would be disregarded in favor of maintaining the Lease Sale schedule. In other words, the response letter could be used to override virtually any recommendation of any governor at any time, in order to proceed as the DOI Secretary desires.  It is apparent that such response, without more, falls well short of the "reasonable balance" required.  *See* 43 U.S.C. § 1345(c) and 30 C.F.R. § 256.31(c).

While the Court cannot discern, on the face of these letters, that a substantial likelihood of success on the merits of the § 19 claim under the OCSLA exists, the State has made a *prima facie*

---

[38] "The committee did not believe that any state should have a veto power over OCS oil and gas activities. The committee fully expects, however, that the advice of the governor be given full and careful consideration, and be incorporated into the ultimate decision of the Secretary, insofar as they are not inconsistent with the balanced approach to OCS leasing set out in this act." H.R. Rep. 95-590, at 153.

[39] *See* Pls' Exh. 13, wherein the Governor recommends postponement of proposed Lease Sale 200 to "ensure that MMS has the opportunity to engage in a meaningful assessment of OCS activities in light of the circumstances confronting Louisiana's coastal areas, as a consequence of the devastation from the hurricanes of 2005."  Thus, the recommendation is two-fold:  delaying the Lease Sale 200, and proper and appropriate compliance with the OCSLA regulations.  *See* 43 U.S.C.  § 1802(2) & (7).

case that the offhanded dismissal of the Governor's recommendations with only a general response was not a serious consideration nor a reasoned determination to accept or reject these recommendations, in favor of a deliberate and forced effort to meet a preexisting scheduled lease sale date. Accordingly, on the showings made at this juncture of these proceedings, since the record indicates a *prima facie* case, if not an outright substantial likelihood of success on the merits, in favor of Plaintiffs pursuant to 43 U.S.C. § 1345(c) and 30 C.F.R. § 256.31(c), the Court cannot say that the Defendants' conduct clearly satisfies even the "arbitrary and capricious standard" which it must meet.

**B.   Irreparable Harm**

Perhaps the single most important factor supporting the issuance of preliminary injunctive relief is a finding of irreparable harm which the Plaintiffs would suffer during the pendency of these proceedings, if such relief were not granted at this time. Plaintiffs have the burden of demonstrating this. Thus, the undersigned has focused on precisely what will happen in the next ninety-one (91) days that must be prevented in order to prevent the suspected harms to Plaintiffs.

**1.   Statutory violations do not necessarily mandate preliminary injunctive relief.**

Though the Court believes that Plaintiffs have established at least a *prima facie* showing of statutory violations on the part of the Defendants, such statutory violations do not, in and of themselves, constitute irreparable harm for purposes of injunctive relief on a preliminary basis. *See Amoco Prod. Co. v. Village of Gambrell, AK,* 480 U.S. 531, 544 (1987); *Weinberger v. Romero-*

*Barcelo,* 456 U.S. 305, 313 (1982); *U.S. v. Marine Shale Processors,* 81 F.3d 1329, 1349 (5ᵗʰ Cir. 1996).  Again, the Court is focused on what immediate and near-term effect such statutory violations, even assuming a substantial likelihood of success in proving them, would be between the present date and the upcoming trial date.  There is no apparent indirect or cumulative impact which Plaintiffs would suffer as a result of these statutory violations, as a judgment on the merits completely in favor of Plaintiffs would mandate the Defendants' compliance with the relevant provisions of the NEPA, the CZMA, and the OCSLA, and possibly injunctive relief until such time as Defendants comply with such mandate.

**2.**   **Threatened environmental harm is not so immediate and imminent to warrant pre-trial injunctive relief.**

Though injunctive relief is appropriate where threatened environmental harm can be demonstrated, a plaintiff must show some concrete injury or environmental harm resulting from defendant's actions, and, in order to be considered "irreparable", the injury must be permanent or of long duration, not subject to re-dress by either equitable or legal remedy following trial.  *See Amoco Prod. Co.*, 480 U.S. at 544*; Canal Auth. v. Calloway,* 489 F.2d 567 (5th Cir. 1971); *Fund for Animals v. Clark,* 27 F. Supp. 2d 8 (D.D.C. 1998); *George Washington Homeowners Ass'n v. Widnal,* 863 F. Supp. 1423 (D. Colo. 1994).  Cognizant "that the State's concern is primarily with the indirect (secondary) and cumulative effects related to Lease Sale 200, which pose a threat to the State and its communities, resources, and infrastructure" (Pls' Memo. at 65), the Court can find no specific and imminent action which would create such harm between now and the trial date.  At oral argument, counsel for the State did not identify any specific action of the Defendants (or their prospective lessees), but rather argued that a "holistic picture" of these actions provides an

appreciation for the harm which may *eventually* occur as triggered by the opening of Lease Sale 200 bids on August 16, 2006.  Though the State may be correct that, over time, significant injury to the State and its communities, resources and infrastructure might occur as a result of Lease Sale 200 operations (on top of all previously granted leases and currently occurring mineral exploration and development), such future indirect and cumulative effects do not demonstrate the irreparable harm necessary for preliminary injunctive relief at this juncture.

Although Plaintiffs complain that tangible physical operations from Lease Sale 200, even if we assume they are to commence immediately (which they do not) cause irreparable harm to the coastline and the State's infrastructure, it is undisputed that operations currently are being conducted pursuant to previous federal lease sales (including those issued in connection with the present five year plan) as well as mineral resource exploration, recovery and refinement conducted pursuant to State authority.  Counsel for the Plaintiffs indicated that such activities are subject to various regulations controlled by the State, including regulations that ensure no net loss of land mass, however, wear and tear on roads and bridges, refinery capacities, population, air and water quality, and other societal impacts are nonetheless felt, even if slightly.  In other words, existing operations are already causing most of the present harm about which Plaintiffs are concerned herein; and the opening of Lease Sale 200 bids on August 16, 2006 and awarding such successful bids between now and November will not have such an immediate impact as to warrant preliminary injunctive relief to prevent such harms occurring due to causes unrelated to Lease Sale 200.

3. **Pre-trial activities of Defendants (and their Lessees) are limited to those allowed by Federal Regulation.**

Upon questioning at oral argument, counsel for MMS and DOI stated that, following the

34

opening of bids, evaluation of such bids for legal compliance, and the awarding of such bids, the only possible activities anticipated would involve sonar examination and bottom testing/sampling. These "ancillary activities" are limited by law. *See* 30 C.F.R. § 250.105; 43 U.S.C. 1340(c). In fact, any such activities that could cause "undue or serious harm or damage to the human, marine, or coastal environment" are not permitted under 30 C.F.R. § 250.209 and 30 C.F.R. § 250.202.[40] *See also Secretary of the Interior v. California,* 464 U.S. 312, 339 (1984). Defendants assert that the opening, review, and acceptance/rejection of bids may take up to ninety days.[41] (Defs' Memo. at 20-21) Though the State expresses valid and compelling concerns regarding its coastline as well as onshore infrastructure, these "ancillary" activities, if conducted between now and the trial date, do not demonstrate the type of irreparable harm necessary for the issuance of a preliminary injunction. Thus, the generally-stated harm cited by the Governor and State are real and demonstrable, but will not be enhanced by the opening of lease bids on August 16, 2006 and the subsequent awarding of such bids between now and the trial date. In fact, any injunctive relief provided by this Court

following the trial in November will be just as effective as the preliminary injunction sought at this point in time.

**4.    Injunctive relief based on Plaintiffs' claims is still available to ensure the NEPA, the CZMA, and the OCSLA compliance at trial.**

---

[40]To the extent any activities other than these "ancillary activities" occur or are set to occur prior to the November 13, 2006 trial date, Defendants and Intervenors are hereby ordered to provide ten (10) days' prior written notice to this Court and Plaintiffs.

[41]Thus it is no coincidence that the Court has chosen the November 13, 2006 trial date.

On the other hand, in an attempt to downplay the significance of the NEPA, the CZMA and the OCSLA compliance at this stage of the offshore lease program, Defendants and Intervenors describe later junctures wherein additional "exploration plans" and "development operations coordination" documents must be filed in order to pass the NEPA and the CZMA consistency reviews. *See* Defs' Memo. at 3-6; Intervenor's Memo. at 5-8. In so arguing, Defendants and Intervenors fail to address the shortcomings of the environmental review materials required at *this* stage of the leasing process. This argument, moreover, suggests the unfounded notion that the NEPA, the CZMA and the OCSLA compliance at the outset of the Lease Sale 200 process is merely a "speed bump" on the road to a predetermined destination. The black letter law of Congress, however, is quite to the contrary. The assurance of Intervenors that "further regulatory approvals are required at later stages" (Intervenor's Memo. at 2) hardly diverts this Court's attention from these threshold requirements of federal law, and the Defendants' apparently inadequate attempts to comply with them. Because the State has timely raised these claims now, the trial will not consider what Defendants (or lessees, or any other parties, for that matter) will do in the future.

5. **The failure of the State to avoid irreparable harm by timely meeting with MMS and DOI as offered displays lack of urgency.**

In both the Complaint and the Motion for Preliminary Injunction, the Governor complains that, despite attempts to schedule a meeting in July 2006 between authorities with MMS, DOI, and the Governor to discuss the claims made herein, no such meeting occurred. Counsel for the Governor states: "The meeting (which was set for June 29, 2006) subsequently was cancelled, due to scheduling conflicts involving critical state personnel in light of MMS's effort to schedule the meeting around the Fourth of July holiday and the federal agencies' apparent unwillingness to have any later meeting than that, because of the timing, might affect the schedule for the Final Notice of

Sale." Pls' Memo. at 17.  At oral argument, the Court also inquired as to why such meeting did not

occur and was told much the same by Plaintiffs' counsel. [42]

On June 21, 2006, MMS Regional Director Chris Oynes notified Governor Blanco, in

response to the State's June 14, 2006 objection to MMS's CD for Lease Sale 200, that, although

MMS believed that the proposed Lease Sale was consistent with the policies of LCRP, MMS would

be willing to meet with her or LDNR staff to review it in order to address the State's concerns.  The

exhibits submitted indicate that the State *declined* a meeting with MMS as late as July 7, 2006,

ostensibly on its belief that "MMS has not provided any indication that it is open to altering its

Consistency Determination or revisiting its Environmental Assessment and Finding of No New

Significant Impact."  Pls' Exh. 17.

The failure of the Governor and/or State authorities to meet with representatives from MMS

in a timely fashion, whether due to "scheduling conflicts" involving the Fourth of July holiday or

because of doubts (no matter how reasonable) regarding the productivity of such a meeting,

undercuts the State's irreparable harm argument:  sounding frantic alarms of such immediate and

drastic injury without traveling every avenue to resolve the purported crisis makes the State's

position appear less compelling.  Indeed, if imminent irreparable danger to the Louisiana coastline

were to occur on the very day of August 16, 2006 (or shortly thereafter), it would seem that a

meeting offered by the purported wrongdoers to discuss such irreparably harmful action would be

quite welcome, even if it ultimately proved to be unfruitful.  It is incumbent on one who fears

---

[42]Counsel for Defendants stated at oral argument that representatives of MMS were always prepared to meet with Plaintiffs' representatives, but such meeting did not occur due to problems on the Plaintiffs' end. Given the notification schedule they were legally obligated to follow, Defendants appropriately offered a specific window of time to meet with the Governor and DNR personnel.

irreparable harm to take such reasonable actions to avoid such harm before marching into Court. Instead, whether due to tenuous excuses such as "scheduling conflicts", the Fourth of July holiday, or their own pessimism, State authorities eschewed the opportunity to meet and be heard.

### 6. Cases cited by Plaintiffs to support a finding of "irreparable harm" are distinguishable.

Plaintiffs cite four cases—none in this circuit—in support of their contention that the irreparable harm stemming from the Lease Sale 200 mandates a preliminary injunction. Those cases, however, can be distinguished. In *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), the appeals court affirmed in part and reversed in part a district court's decision (on summary judgment, not on a preliminary injunction request) enjoining oil drilling in the Flathead National Forest. The central issue in that case was whether particular lease sales would cause immediate disruption of environmentally sensitive lands. The appeals court made a distinction between two types of leases—"no-surface occupancy" ("NSO") leases that prohibited disruption of the land, and non-NSO leases that would have allowed lessees to immediately begin building roads and other infrastructure related to drilling. *Id.* at 1445. The district court injunction was affirmed only in respect to the latter leases, which lends support to the proposition that the important issue in considering injunctive relief is whether the harm is irreparable. In that case, the sale of non-NSO leases truly did represent a "go/no-go point of commitment." *Id.* at 1448. As explained above, that is not the case here.

Similarly, plaintiffs cite two First Circuit cases, *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983) and *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989). In the first case, the appeals court upheld a district court order issuing a preliminary injunction stopping lease sales off the New England coast. In affirming the district court's finding of imminent harm, the appeals court held that

38

> NEPA is not designed to prevent all possible harm to the environment; it foresees
> that decisionmakers may choose to inflict such harm, for perfectly good reasons.
> Rather, NEPA is designed to influence the *decisionmaking process*; its aim is to
> make government officials notice environmental considerations and take them into
> account. Thus, when a decision to which NEPA obligations attach is made without
> the informed environmental consideration that NEPA requires, the harm that NEPA
> intends to prevent has been suffered.

*Id.* at 952 (emphasis added). Four years later, however, the Supreme Court held in *Amoco Prod. Co.,*

480 U.S. 531, that the Ninth Circuit was in error when it focused on harms to the *procedural*

*process*, rather than harms to the environment, in holding that violation of a NEPA-like statute in

a lease sale created a presumption of irreparable injury that supported injunctive relief. The next

year, the First Circuit returned to the issue in *Marsh*. The appeals court held that *Amoco Production*

did not overrule its decision in *Watt*, but did "add one further note of explanation." *Marsh*, 872 F.2d

at 500. "In *Watt* we simply held that the district court should take account of the potentially

irreparable nature of this decisionmaking risk to the environment when considering a request for a

preliminary injunction." *Id.* at 501. With this limited view of the First Circuit's holding in *Watt*, this

Court is in agreement, and hence is why the motion for a preliminary injunction is denied—because

this Court has determined that the irreparable risk to the environment is low in light of the activities

that the Lease Sale 200 will allow before trial, the decision to hold a trial on the merits 91 days from

issuing this order, and the finding that plaintiffs are substantially likely to prevail on the merits of

at least one of their claims at that trial. Read in this light, *Watt* and *Marsh* confirm this Court's view

that injunctive relief is inappropriate at this time.

Finally, plaintiffs cite *Natural Resources Defense Council v. Morton*, 458 F.2d 827 (D.C.

Cir. 1972). In that case, the D.C. Circuit upheld a preliminary injunction when the Environmental

Impact Statement regarding the sale of oil and gas leases off the coast of Louisiana did not

adequately consider alternatives that would mitigate the impact to sensitive marine areas. The Court simply disagrees that the factual circumstances in this case warrant the same result. Moreover, the appeals court in *Morton* did not have the guidance of the Supreme Court's decision in *Amoco Production* regarding procedural versus environmental harms in weighing whether to issue a preliminary injunction. Indeed, the D.C. Circuit itself has expressed "doubt [about] the continuing vitality of the rather expansive view of NEPA we expressed in *Morton,* since subsequent Supreme Court cases have directly criticized us for overreading that statute's mandate." *City of Alexandria v. Slater*, 198 F.3d 862, 869 n.4 (D.C. Cir 1999).

For all of these reasons, the Court finds that Plaintiffs have not made sufficient showing of such immediate irreparable harm to warrant injunctive relief on a preliminary basis.  Of course, this does not prevent Plaintiffs from seeking, or this Court from granting, injunctive relief in order to ensure compliance with the previously-cited statutory and regulatory guidelines, if Plaintiffs prevail on the merits, which, again, seems likely.

## C.  Adverse Effect on the Public Interest

The Court has also considered, as it must on applications for preliminary injunctive relief, whether the entry of injunctive relief would have any adverse effect on the public interest.  In this consideration, the Court recognizes the competing interests of the citizens of coastal Louisiana as well as the citizens of the country in general.  Of critical interest to the citizens of coastal Louisiana are environmental protections, the prevention of coastal erosion, the provision and maintenance of infrastructure, and, of course, continued opportunities for employment in the field of development of natural resources.  On a national level, the continued production of energy resources is an obvious factor.  Thus, with these competing interests, the Court finds that injunctive relief issued on a

40

preliminary basis is not warranted, given the imminent trial of the State's claims on a permanent injunctive basis in the near future.  Overall, the undersigned cannot find, at this juncture, that the August 16, 2006 opening of bids on Lease Sale 200 would have an adverse effect on the public interest, and whatever effects, if any, that would be experienced by the opening and awarding of such bids between now and the trial date of November 13, 2006, are minimal.  Accordingly, consideration of this factor weighs against the issuance of a preliminary injunction at this time.

## D.  Favorable Balance of Hardships/Potential Harm

Plaintiffs contend that the simple postponement of the Lease Sale until DOI and MMS have complied with their legal obligations under the NEPA, the CZMA, and the OCSLA would create no hardship on the Defendants and/or Intervenors.  Plaintiffs argue that forcing the Defendants to comply with federal law cannot possibly be considered a "hardship."  Although the Court agrees that forcing the Defendants to meet their federal obligations by providing reasonable responses and by properly evaluating the potential impacts of operations conducted pursuant to the Lease Sale would not be a hardship, and will so order if warranted after trial, the Court also recognizes that economic hardships might be incurred by others impacted by preliminarily-issued injunctive relief.  This would include not only Intervenors, but also individuals who reside in coastal Louisiana and who are employed in the oil and gas industry.  Preliminary injunctive relief foreclosing Lease Sale 200 bidding and "ancillary activities" at this time, before the November trial, when such activities will undoubtedly be necessary in the future (after statutory compliance is ensured), serves little purpose but may create hardships for non-parties.  Thus, considering the hardships of residents and businesses in coastal Louisiana, such a factor would seem to weigh against the issuance of a preliminary injunction sought by the State herein.

The Court is mindful that Intervenors and others interested in the successful bidding on Lease Sale 200 will be greatly inconvenienced by the notion that injunctive relief after the November trial might indeed be necessary.[43]  Intervenors are concerned that a "delay in the receipt of revenues" from the Lease Sale would be costly (Intervenor's Memo. at 11); and that API members "have spent millions of dollars preparing to bid on Lease Sale 200" (*Id.* at 10).  In his affidavit (Defs' Exh. A), MMS Deputy Regional Director Charles Schoennagel, Jr. makes dire predictions[44] that, if injunctive relief is granted herein, bidders may not bid, or withdraw or reduce their bids due to "uncertainty"; in that "revenues to the U.S. Treasury may be reduced ..."  Indeed, compliance with federal law can be a costly and bothersome proposition.  This Court's responsibility, however, despite these adumbrations, is ensuring compliance with the statutory expressions of the United States Congress.

Nonetheless, those who bid on Lease Sale 200 do so now with such knowledge that, in the opinion of the undersigned, Defendants' compliance with the NEPA, the CZMA, and the OCSLA is questionable at best, and that Plaintiffs have a substantial likelihood of prevailing on the merits of one or more of these claims at the November trial.  Injunctive relief to ensure compliance may

[43]At oral argument, counsel for Defendants states that the failure of the Lease Sale to go forward as scheduled on August 16, 2006 could create a "climate of uncertainty in the oil and gas industry about development of natural resources off the Louisiana coast."  The real "climate of uncertainty", however, hovers over south Louisiana as its resources are harvested by way of miles of pipelines and navigation channels, its infrastructure is taxed to the near breaking point, its natural buffer against hurricanes is carved and shredded as a result of ongoing and future offshore activities, and its coastline vanishes into the Gulf.

[44]Compare those characterizations with Defendants' assertions in arguing the NEPA compliance: "MMS's conclusions are reasonable based on the fact that, in general, a lease sale in the Western Planning Area of the Gulf of Mexico, such as Lease Sale 200, represents *only* approximately 2.6 to 3.3 percent of the OCS activity in that planning, and *only* about 1 percent of the Gulfwide OCS program.  Multi-sale EIS at 4-4." (underline as quoted; italics added.)

42

well be in order.  Thus, Intervenors and others similarly interested in participating in the Lease Sale 200 process may guide their conduct accordingly, and factor in the risks associated with the apparent failure of MMS and/or DOI to satisfy their obligations on one or more of these federally-mandated requirements.  Through this Court's candid assessment of Plaintiffs' likelihood of prevailing on the merits, these parties may employ the doctrine of *caveat emptor* on August 16, 2006.

## V.  <u>CONCLUSION</u>

In conclusion, despite a showing of substantial (if not imminent) likelihood of prevailing on the merits on at least one of the statutory grounds of the State's Complaint, the Court finds it unnecessary and unwarranted to issue preliminary injunctive relief given the November 13, 2006 trial date, due to the lack of specific irreparable harm threatened between now and then.  The Court further notes that, during the pendency of these proceedings, much can be done by the parties to resolve many of their differences, with or without the guidance of the Court.  In lieu of such resolution, the Court orders as follows on the showings made:

(1)     Plaintiffs' Motion for Preliminary Injunction be and is hereby **DENIED**;

(2)     Counsel for all parties are to confer (with the assistance of the assigned magistrate judge, if necessary), no later than Monday, August 29, 2006, to determine what, if any, discovery will be necessary to prepare this matter for trial;

(3)     A pre-trial conference will be held in this matter on Friday, November 3, 2006, at 9:30 a.m.; the final pre-trial order shall be due by 4:30 p.m. on Tuesday, October 31, 2006;

(4)     The parties are to confer with the magistrate judge to discuss a possible resolution

43

of this matter no later than Friday, October 28, 2006; and

(5)     Trial in this matter, including the Plaintiffs' request for permanent injunctive relief,

is fixed for **Monday, November 13, 2006**, at **8:30 a.m.**

New Orleans, Louisiana, this 14th day of August, 2006.

_____

**KURT D. ENGELHARDT**
**United States District Judge**

44